1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

11

EASTERN DISTRICT OF CALIFORNIA

12

—o0o—

13
14

| | |
|---|---|
| VANG CHA YANG,<br><br>               Petitioner,<br><br>   v.<br><br>GAIL LEWIS, Warden,<br><br>               Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:02-CV-06408 LJO JMD (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc #1] |

15
16
17
18
19
20

21        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

22   pursuant to 28 U.S.C. § 2254.  This action has been referred to this court pursuant to 28 U.S.C.

23   § 636(b)(1) and Local Rule 72-302.

24                                    PROCEDURAL HISTORY

25   _____Petitioner is currently in the custody of the California Department of Corrections pursuant

26   to a judgment of the Superior Court of California, County of Fresno, entered on February 18,

27
28

1   1999.  *See* Respondent' Answer to Petition of Writ of Habeas Corpus, Ex. A.[1]  Following a jury

2   trial, Petitioner was found guilty of violations of California Penal Code sections 261(a)(2) [rape],

3   264.1 [rape in concert], 288(b)(1) [false imprisonment], 286(c) [sodomy], and 286(d) [sodomy in

4   concert] involving three victims.  Id.   In addition, Petitioner was found guilty of committing these

5   crimes for the benefit of a street gang pursuant to 186.22(b)(1).  Id.  Petitioner was subsequently

6   sentenced to 94 years and four months in prison. Id.

7        Thereafter, Petitioner timely filed a notice of appeal with the California Court of Appeal,

8   Fifth Appellate District, (hereinafter "5th DCA") and filed an appellate brief on December 17,

9   1999.  The People filed a responsive brief on April 20, 2000.  On August 9, 2001, the Fifth DCA

10  reversed judgment on four counts as lesser included charges and affirmed the judgment as to the

11  remaining charges. Ex. D.  On September 12, 2001, Petitioner timely filed a Petition for Review

12  in the California Supreme Court.  Ex. E.  Said petition was denied on November 14, 2001. Ex. F.

13       On November 12, 2002, Petitioner filed the above-captioned federal habeas petition,

14  alleging 12 claims including:  conviction based on insufficient evidence; improper admission of

15  evidence; improper exclusion of witness testimony; several claims of improper jury instructions;

16  cumulative error; several claims of improper sentencing; and cruel and unusual punishment.

17       On March 31, 2003, Respondent filed an answer to the petition.

18                          **FACTUAL BACKGROUND**

19  _____ The Court adopts the facts as summarized by the 5th DCA in its opinion dated August 9,

20  2001:

21       On April 5, 1998, a Sunday night, 14-year-old Maney asked her friends Kia (12 years old)
22  and Kaoying (13 years old) to go cruising with her ex-boyfriend Sim, and some friends.  The
    girls joined a carload of young men, which eventually included Money (driving), Sim, Lor,
23  Boomee, Xee and Heavy, all members of the Mongolian Boys Society (MBS) gang.  After
    driving around for a while, Money parked at a Motel 6.  Someone told the girls to get out of the
24  car and go to room 115.  The girls entered room 115 and saw that more men were inside,
    including MBS members Bolo and Bubbles.  Defendant who was 24 years old and known as
25  "Diamond," was also in the motel room at some point.  Additional men occupied the adjoining
    room, number 116.
26       Later that night, Kia saw Maney taken into the bathroom.  Kia became nervous when
    Maney stayed in there for a long time.  Maney was in the bathroom with Sim and Bolo when

27

28  _____
    [1]  All subsequent Exhibit references are to the exhibits attached to Respondent's Answer, unless otherwise
    noted.

    2

    ed

Bolo confronted her for allegedly "talking shit" about the MBS. She denied doing so, and Sim attempted to defend her. Sim and Bolo agreed to resolve the dispute by arm wrestling. If Sim lost, he would allow Bolo to "pimp" the girls. Bolo was the "shot caller" in the gang, and the other members of the gang were supposed to do as he said. Sim apparently lost the arm wrestling match because Kia saw men going in and out of the bathroom while Maney was inside. Four men raped Maney during this time, before midnight. When Maney emerged from the bathroom, here eyes were red and she looked "freaked out." Maney told Kia the men were going to rape her and Kaoying, and she was sorry she had brought them there.

Kaoying was raped next. Bubbles approached her and repeatedly tried to kiss her. When she continued to resist, Bubbles pushed her against the wall and told her she was not going home. Bubbles continued to harass her, and Lor began pressuring her to be with Xee. When Kaoying refused, Lor told her she could be with Xee or with Bubbles. Kaoying opted to be with Xee, but resisted physical contact with him. Subsequently, Lor told her "do it with Xee then nothing else is going to happen....Just do him or do everyone." Kaoying then understood Lor was directing her to have sexual intercourse with Xee, and if she did not, she would have to have sex with all the others. A crowd of men gathered around and told Kaoying it's "either him or...us." Kaoying agreed to have sex with Xee but no one else.

Lu Vang (Louie) came to the motel shortly after midnight with Xee and Bubbles. There were 15 to 20 people there, including three girls – Maney, Jennifer and one whose name he could not remember (Kia). Louie saw men going in and out of the restroom. A short while after arriving, he entered the bathroom and found Kaoying inside. She thought Louie was there to rape her, told him "no," and began to cry. Louie asked what was wrong and Kaoying told him she had been raped. Louie was afraid of the other men and told her he could not take her home. He stayed in the bathroom with Kaoying for awhile to keep the others out.

When he left the bathroom, Louie saw Kia having sex with someone in the hallway by the closet in the room, and assumed they were boyfriend and girlfriend. Other people were standing around teasing, making jokes and throwing ice on them. Louie left Bubbles at the motel and went home.

According to Kia, the gang told her if she did not agree to have sex with Lor, she would have to have sex with all the men. After having sex with Lor, six men, including Nippy, Money, Bolo, Bubbles, Balloon, and a man she did not know by name, raped Kia. The rapes were committed in two groups, about five hours apart. Kia could not recall specific details or an order, but Nippy followed Lor, and the man whose name she did not know was last. The first two or three raped her at about 12:30 a.m. The others raped her at about 5:30 a.m. Sim and others threatened that the girls would be taken to Washington, pimped and killed if they did not cooperate. Bolo told Kia he would eventually take her home, but first he was going to pimp her to as many men as he wanted. Bolo also committed sodomy on Kia despite her plea to be left alone. In addition, at one point Bolo made Kia get on top of him, and Money told her to perform fellatio on him while Bolo raped her. She complied because she was afraid that if she did not, they would kill her. At some point, Balloon hit Kia with his hand, leaving a bruise on her arm.

Sometime on Monday, a maid came by to clean the room. A man opened the door and exchanged wet towels for clean towels. The dirty towels were spotted with blood.

Monday evening, after Kia was in the bathroom for the second time, Bolo came to Kaoying and told her that his "homeboy" Diamond liked her. Bolo told her to have sex with defendant, who stood a few feet away. She refused and asked Bolo to take her home. Bolo said he would if she had sex with defendant, but numerous others would rape her if she refused. Defendant took Kaoying into the bathroom and raped her. Afterward, Balloon went into the bathroom and raped her. Kaoying kept fighting Balloon off until he told her to take a shower with him, promising nothing else would happen. In the shower, Balloon tried to get Kaoying to bend over, but she refused. Balloon pushed Kaoying down by the shoulders and orally copulated her. After Balloon left, Kaoying showered, dressed, and left the bathroom.

At around 6:00 p.m. Monday evening, Louie returned to see if Kaoying was still there. All three girls were present, as well as the men. Kaoying approached Louie and they went into the bathroom, where Kaoying again told him she wanted to go home and gave him her phone number. As they talked, Kia and Maney joined them and asked Louie to call their parents. Louie

memorized Maney's telephone number because they decided her parents were the most likely to be home. Louie then sat on the bed for awhile so as not to arouse suspicion, and subsequently left. After thinking about it for about 20 minutes, Louie called Maney's house. He told Maney's brother where the girls were located.

After Louie left, Kia pretended to faint, hoping the men would leave them alone because they were tired and had not slept. When she did so, most of the men left, except for Balloon, Sim, Money and Xee. Kia was placed on the bed and Kaoying fell asleep next to her. She awoke and heard Sim talking on the telephone telling the other person to come and get the girls and take them to Spokane, Washington, in the morning. Maney had previously told her that the men said they were going to sell the girls to old men for $2,000. Kaoying noticed Maney was gone and the door to an adjoining room was open. Kaoying closed her eyes, and when she opened them, she saw a man touching Kia's thigh. Kaoying told him to stop and then she told Kia to wake up, and she did so. After they were fully awake, Maney came back crying. Maney told them that there were five older men in the next room. Sim told Maney that if the girls would have sex with these men, he would take them home and not let them be taken to Washington.

Kaoying did not believe they would be taken home, but Maney implored her to believe Sim because it's "the only chance we've got." Maney and Kia went into the other room, and the man who had been touching Kia told Kaoying to take off her pants. Kaoying complied because she believed this was her only hope of avoiding being taken to Spokane. Kaoying told him she did not want to have sex. However, the man got on top of her by the bathroom area and had sex with her. Kaoying began to cry and told the man to stop. A short while later the man stopped and got off of her. Afterward, Kaoying put on her clothes and took another shower. Eventually the three girls were back in the room standing together. Sim told them there was one more man left, and that one of them had to "take him." None of the girls wanted to do it, and as they debated who should do it, the police knocked on the door.

Officers were called to the Motel 6 to locate possible runaways, particularly Maney. When they arrived at about 12:30 a.m. Tuesday, only Sim, Xee, and Money were in room 115 with the three girls. Balloon ran into room 116 because he did not have his pants on, and Money was asleep in bed. Sim and Xee were standing wearing only their pants with the belts undone. There was a mattress on the floor outside the bathroom. Clothes and used condoms were scattered around, and the room smelled strongly of semen. The officer spoke to one of the men who said he was just hanging out with friends and denied having had sex. He claimed his cousin and some friends had been in the room prior to his arrival, and the used condoms were on the floor when he and his friends arrived. The girls did not tell the police what had occurred because they were afraid. They also felt ashamed and did not want their parents to know what had happened.

Balloon's pants were on the floor near a desk. His wallet was in the pants pocket, chained to a belt loop. While the police were talking to Sim, Xee, and Money outside, the girls discussed what they were going to say and concocted a story about being in Visalia. Also during this time, Maney and Kia discussed taking Balloon's wallet. Kai wanted to tell what happened even though Maney and Kaoying did not want to do so. Kia wanted the wallet as evidence, and Maney took it with her. The wallet contained a photograph of defendant and Balloon.

Maney's father came to the motel and picked up the three girls. They lied and told him nothing had happened. The girls made up a story that they had been kidnaped by several men and taken to a pink motel in Visalia, where they were locked in the bathroom and asked for sex. The girls maintained their story that they had not been raped. They claimed they escaped and called Sim, who picked them up and drove them to the Motel 6. When Maney's dad questioned the story, they claimed they hitchhiked to Visalia. When Maney's father confronted Kia stating he knew they were lying, Kia admitted they had been raped. In an effort to conform the events to the initial lie, the girls claimed that all the rapes took place in one night after returning from Visalia.

Maney's father called the Clovis police. He also believed they should not disclose the rapes because of the danger to their families. The girls told Officer Henderson that four Asian men had kidnaped them and pressured them for sex. They claimed they were driven to a motel in Visalia and locked in the bathroom, but eventually escaped and called Sim to pick them up.

Henderson sensed the girls were holding back information, however, he did not push the interview because the girls seemed exhausted.

Kaoying's school identification card was found in room 115 of Motel 6 and turned over to Clovis police. After policed determined the Visalia motel described by the girls did not exist, the officers confronted Maney, who then admitted they had been gang raped in room 115. Kaoying and Kia also admitted they had been raped.

Once it was determined no kidnap had occurred in Clovis, the investigation was transferred to Fresno, and arrangements were made for a sexual assault exam. The exams revealed findings consistent with the history given by the girls. Although sperm was found in all three victims, none was linked to defendant.

After the incident, Sim called Maney and threatened her with prostitution and death if she did not return Balloon's wallet.

The girls finally told their entire story to the grand jury under penalty of perjury. While staying at a safe house, the girls met with Detective Brenda Trobaugh and told her they wanted to tell the whole truth. Kaoying gave Trobaugh a statement consistent with her trial testimony. Afterward, Kaoying, Kia and their families moved to a safe house and eventually out of town.

Defendant was arrested on April 24, 1998. He initially claimed he did not know why he was arrested. Moments later, he stated he had read the police reports, which he obtained from the wife of codefendant Ker Hang. Defendant was in a gang in 1994, and had witnesses who could verify his alibi at the time of the rapes. He also pointed out that while one of the victims had described an ORB tattoo on his (Diamond's) arm, he had no such tattoo, and thus did not match the description. Defendant also initially claimed he had never gone by the nickname "Diamond." When pressed, defendant admitted he used that name during the time he was a gang member. He stated his alibi was Gerry (Julie) Yang, his girlfriend. However, defendant claimed he did not know Julie's phone number or address. Defendant appeared unusually calm during his police interview.

Detective Mart located 16-year-old Julie Yang on April 28, 1998. Julie stated she knew "Diamond," and before Mart mentioned why he was there, she said defendant could not have been present during the rapes because she was with him that night. She volunteered to give Mart a page in her daily planner, which contained detailed notes of her activities with defendant during the first weekend in April, including specific timing of a telephone conversation. When Mart asked to see the rest of her planner, Julie became belligerent and uncooperative. Mart obtained the planner from Julie's mother. The remainder of the planner did not contain similar detail.

Defendant rented a room at the London Motel on February 15, 1998. However, he was not listed on the registry during April 1998. Also, as of March 28, 1998, the Motel 6 on Parkway Drive prohibited defendant from renting a room because he had previously done so for minors.

Eleven days after the rapes, Kia went to the doctor complaining of vaginal pain and itching. The doctor noted minimal physical findings and believed Kia's problems stemmed from the emotional issues consistent with the history of recent rape.

Gang expert John Chandler confirmed the gang membership of most of the men involved in the rapes, including defendant, Sim, Money, Balloon, Xee, Bolo, Bubbles, Nippy, Boomee, Gangsta, Heavy, Lor, and Cat. In a letter recovered from Bolo's home, he wrote, "Mongolian Boys Society pimping is my game, Bolo is my name." Although defendant denied being a current gang member, he exchanged letters discussing gang activity with gang members in prison.

Defendant admitted he had been previously convicted of two robberies.

### Defense

The Defense focused on the victims' initially false reports and implied the victims either willingly participated in prostitution at the motel or were willingly being "sexed into" the gang.

Defendant's parents testified as alibi witnesses that defendant was home Monday night, April 6, 1998.

Tou Her, a man of Hmong descent with a PhD in sociology, testified that in the Hmong culture it is not uncommon for a 12- to 15-year old girl to marry a man in his 20's. However, Her also testified that there is a realization in the Hmong community that a girl must be of legal age

ed

to marry. In the Hmong tradition, a ritualized form of elopement was recognized where a man could take home the woman he wanted to marry and then send word to her family afterward. However, such a taking was not supposed to be against the woman's will. Prostitution is not prevalent in the Hmong culture, and would bring shame not only to the girl's family, but the entire clan. According to Her, many Hmong youth are assimilated into American culture. Gang members in particular do not conform to traditional Hmong culture. Membership in Hmong street gangs is totally an American concept, and not true to the Hmong culture from Laos.

Defendant testified and admitted prior convictions for robbery, receiving stolen property, and cocaine sales while in possession of a gun. He also admitted having been a member of the MBS, but claimed he "jumped out" in 1994. Defendant claimed minimal association with gang members after that, such as a passing hello or giving them a ride. On the weekend of March 27, 1998, the weekend before the events in this case, defendant gave a ride to Scissors and Bolo. They ran into some girls at a Laundromat, picked them up, drove around awhile, then went to the Motel 6 where defendant rented a room for the girls because they had no place to go. Defendant, Bolo and Scissors left the girls alone in the room and left, and defendant never returned. He denied knowing the girls were raped in the room that night.

On April 4, 1998, at about 3:30 p.m., defendant tried to rent a room at the Motel 6 to be by himself and avoid the pressures of his family, girlfriend, and parole officer, but he was denied a room. He left and picked up his girlfriend, Julie, and went to Thong's (Bubbles') house, where they watched two movies. He gave Jennifer and Crystal a ride to the Motel 6, where he stayed for a short time and left to drive Julie home at around 8:30 p.m. Defendant testified in detail as to his actions after he dropped off Julie at her home. He went to sleep, received a brief call from Julie around 10:50 p.m., got up at 4:00 a.m., had some coffee and went to work. Defendant arrived home about 2:00 p.m., played with his dog, went to Julie's house, watched two movies at Thong's house, and took Julie home. However, Julie was locked out, so he took her to the London Motel where they rented a room and spent the night.

The next day (Monday) , defendant dropped Julie off, went home, took his family members to a wedding, and came home at about 2:00 p.m. He played with his dog and went to Julie's house at 4:00 p.m. They drove around, ran into Heavy, and gave him a ride to Motel 6, where they waited for 15 minutes, and then drove him home. Defendant and Julie went to a barbecue in the park, then he dropped everyone off and went home at 9:15 p.m. Defendant talked to his girlfriend on the phone for an hour before going to bed. He was awakened in the middle of the night by a phone call from the police asking him to pick up Sim, a juvenile, from the motel.

Defendant learned he was a suspect in the rape case on April 23, 1998, when he saw the police report at his niece's house. Defendant was arrested at home the next day. Contrary to Detective Mart's testimony, defendant testified he gave Mart Julie's phone number. Although defendant admitted knowing gang members, he denied knowledge of most of their monikers and gang status. Defendant denied raping Kaoying or seeing anyone else rape Kaoying or Kia.

**Rebuttal**

Fourteen-year-old Linda C. testified she skipped school with her friends Linda H. and Pang in March of 1998. They ran into defendant at a Laundromat. The three girls agreed to go driving with defendant in his car, along with Bolo and Scissors. Before getting into the car, the girls asked to be brought back by 7:00 p.m. After going to the park, defendant drove to Money's house where the three men spoke with Money on his front porch. When the three got back into defendant's car, defendant began talking about going to a motel. None of the girls asked to be taken to a motel. After driving to a Motel 6, defendant rented a room and everyone went inside. The men left them there alone, and the girls watched television. Sometime later, a group of men arrived, including defendant, Bolo, Sim, Money, Balloon, Boomee, Nippy, Lor, and at least four others. Defendant then left. After awhile the girls asked to be taken home, but were not allowed to leave. Money sat in front of the door, blocking it. Subsequently, five men, including Bolo, Balloon, Nippy and Sim, raped Linda C. The girls were not permitted to leave until the next day.

**DISCUSSION**

1

## I.  **Jurisdiction**

2

3           Relief by way of a petition for writ of habeas corpus extends to a person in custody

4   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

5   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6   529 U.S. 362, 375 fn. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

7   guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the

8   Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. §

9   2254(a); 2241(d).  Accordingly the Court has jurisdiction over this action.

10          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

11  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12  enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008 (1997); Jeffries

13  v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th

14  Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy,

15  521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment).  The

16  instant petition was filed after the enactment of the AEDPA and is therefore governed by its

17  provisions.

18  ## II.  **Standard of Review**

19          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

20  custody pursuant to the judgment of a state court only on the ground that he is in custody in

21  violation of the Constitution or laws or treaties of the United States."   28 U.S.C . § 2254(a).

22          The instant petition is reviewed under the provisions of the AEDPA.  Lockyer v.

23  Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, a petition for habeas corpus will not be

24  granted unless the adjudication in question "resulted in a decision that was contrary to, or

25  involved an unreasonable application of, clearly established Federal law, as determined by the

26  Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable

27  determination of the facts in light of the evidence presented in the State Court proceeding."  28

28  U.S.C. § 2254(d); *see* Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

1    As a threshold matter, this Court must "first decide what constitutes 'clearly established

2 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at

3 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining "clearly established Federal law," the Court

4 looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the

5 relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412.  "In other words, 'clearly

6 established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth

7 by the Supreme Court at the time the state court renders its decision." Id.

8    Finally, this Court must consider whether the state court's decision was "contrary to, or

9 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

10 72, *quoting* 28 U.S.C. § 2254(d)(1).  "Under the 'contrary to' clause, a federal habeas court may

11 grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

12 Court on a question of law or if the state court decides a case differently than [the] Court has on a

13 set of materially indistinguishable facts." Williams, 529 U.S. at 413; *see also* Lockyer, 538 U.S.

14 at 72.  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

15 state court identifies the correct governing legal principle from [the] Court's decisions but

16 unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at

17 413.

18    This Court may not issue the writ simply because in its independent judgment the state

19 court decision applied clearly established federal law erroneously or incorrectly; for a writ to

20 issue, 'that application must also be unreasonable." Id. at 411.  A federal habeas court making

21 the "unreasonable application" inquiry should ask whether the state court's application of clearly

22 established federal law was 'objectively unreasonable." Id. at 409.

23    Petitioner has the burden of establishing that the decision of the state court is contrary to

24 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

25 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

26 states, ninth circuit precedent remains relevant persuasive authority in determining whether a

27 state court decision is objectively unreasonable. *See* Duhaime v. DuCharme, 200 F.3d 597, 600-

28 01 (9th cir. 1999).

8

1    AEDPA requires that this court give considerable deference to state court decisions.  The

2    state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  Moreover, we are

3    bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.

4    2002), cert. denied, 537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

5    III.  **Review of Petitioner's Claims**

6         **A.      Ground One  – Insufficient Evidence**

7              1.      Factual Background

8         In his first claim, Petitioner asserts that the trial court erroneously denied his claims of

9    insufficient evidence, both as to the "in concert" element of counts 5, 8, and 12 and of the "force"

10   element of count 2.  Petitioner claims that evidence of his aiding and abetting the gang-type

11   sexual attack was insufficient to constitute in-concert participation, and that there was no

12   evidence to support a finding of "force or violence" necessary to support a conviction..  Ex. D at

13   13, 17.

14             2.      State Court Review

15        Petitioner's insufficient evidence claims were first presented on direct appeal to the Fifth

16   DCA, which denied said claims  in a reasoned opinion on August 9, 2001.  *See* Ex. D.  The

17   claims were then presented to the California Supreme Court in a petition for review and

18   summarily denied on November 14, 2001.  *See* Ex. F.  The California Supreme Court, by its

19   "silent order" denying review of the 5th DCA's decision, is presumed to have denied the claim

20   presented for the same reasons stated in the opinion of the 5th DCA.  Y1st v. Nunnemaker, 501

21   U.S. 797, 803 (1991).

22              a.  The "in-concert" claim:

23        The Fifth DCA found that Petitioner's claim failed in light of longstanding California law

24   holding that liability for in-concert sexual assault attaches to those who aid and abet the crime.

25   *See* Ex. D, citing People v. Lopez, 116 Cal.App.3d 882, 886-88 (1981) and People v. Champion,

26   9 Cal.4th 879, 933 (1995) (overruled on other grounds by People v. Ray, 13 Cal.4th 313, 369, fn.

27   2 (1996).  The court found that:

28        the evidence not only places [Petitioner] at the scene, it establishes he committed

ed

the 'concrete act' of raping Kaoying immediately before his co-conspirator entered and committed an additional rape and oral copulation. This evidence amply supports the in-concert findings because defendant clearly aided Balloon's sexual assaults.[citation omitted] Defendant and other gang members aided each other by executing their plan to isolate the girls at the motel and intimidate them by the overwhelming numbers of men in the room and their refusal to let them leave. Defendant's presence added to this intimidation factor. Further, by having raped Kaoying immediately before Balloon entered the bathroom, he further broke down Kaoying's will to resist, thereby aiding Balloon in his efforts to sexually assault her. Answer, Ex. D, at 15.

      b. The "force" claim:

The Fifth DCA similarly found that there was sufficient evidence of "force or violence" to support defendants rape conviction (count two). The court pointed to the "significant testimony of both force and violence committed upon each captive victim during the in-concert sexual offenses" Ex. D at 17. And the court noted that Petitioner failed to cite to any authority supporting his position that the force and violence committed by his accomplices did not apply to his own acts. Id. at 18.

"In light of the prior conduct, Kaoying knew that if she did not comply with defendant's requests she would be forced to do so by the others. Consequently, the evidence establishes defendant's rape was committed by means of force and violence. The tone had been set. Kaoying was not required to physically resist defendant and risk physical injury by MBS gang members to sustain the jury finding that his rape was accomplished by means of force or violence. [citations]"

Id.

      3.     Analysis of Petitioner's Claim

In reviewing sufficiency of evidence claims, California courts expressly follow the Jackson standard articulated in Jackson v. Virginia, 443 U.S. 307 (1979). *See* People v. Johnson, 26 Cal.3d 557, 575-578 (1980); *see also* People v. Thomas, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual finding is fairly supported by the record is as follows:

"[W]hether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

Sufficiency of evidence claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324, n.16. This Court must presume the correctness of the state court's factual

ed

findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir. 1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597 (1981).

This Court cannot find that the Fifth DCA's conclusion was unreasonable. There was substantial evidence of both of Petitioner's "in-concert" participation in the assault and of the use of "force or violence." With respect to the "in-concert" claim, the state appellate court record reflects that Petitioner acted in concert with the other gang members in carrying out the sexual assaults. Petitioner and other gang members executed a plan to isolate their victims in the motel room and intimidate them with their overwhelming numbers and their refusal to let the victims leave. Petitioner's presence in the motel room clearly added to this intimidation factor.

Moreover, by taking the concrete step of raping Kaoying immediately before Balloon entered the bathroom, Petitioner further broke down the Kaoying's will to resist, thereby aiding Balloon in his efforts to sexually assault her. Kaoying testified that she took off her pants at Petitioner's request because she knew that if she refused the other men would have forced her to do so. The evidence of petitioner's presence in the motel room during the sodomy committed by Bolo of Kia further supports a finding that he acted in concert with the other gang members in the commission of these offenses.

With respect to the "force" claim, as the Fifth DCA notes, Petitioner's argument "ignores significant testimony of both force and violence committed upon each captive victim during the in-concert sexual offenses that occurred over a period of two days." Ex. D at 17. Throughout the ordeal, the victims were subject to numerous threats and acts of violence. They were pushed against walls, forced into the bathroom and physically prevented from leaving, struck with belt and fist, and ordered to have sexual intercourse with one person or face rape by the group. Efforts to leave the motel room were similarly met with force and violence. The attackers posted guards at the door to prevent escape. When one victim attempted to run out the door, she was

1  grabbed by the neck and threatened with a screwdriver.  When the victims attempted to escape

2  through the window, they were pulled back into the room.  The victims' pleas to be taken home

3  were refused.  In light of this prior conduct, Kaoying knew that if she did not comply with

4  Petitioner's requests, she would be forced to do so by the others.  "The tone had been set.

5  Kaoying was not required to physically resist defendant and risk physical injury by MBS gang

6  members to sustain the jury finding that his rape was accomplished by means of force or

7  violence.[citations]"  Ex. D at 18.

8       In light of this significant evidence of both "in concert" participation and "force or

9  violence," Petitioner's insufficiency of evidence claim fails.

10      **B.      Ground Two – Improper Admission of Evidence**

11          1.      Factual Background

12      At trial, the state sought to present evidence of Petitioner's involvement in a similar gang

13  rape at the same Motel 6 the week prior to the events leading to his arrest.  Over Petitioner's

14  objections, the trial court permitted the introduction of this evidence.  Following his conviction,

15  Petitioner appealed to the Fifth DCA, claiming that the trial court's admission of this evidence

16  was a violation of his due process rights.  Ex. E at 6.  The Fifth DCA rejected this claim.

17          2.      State Court Review

18      The state appellate court first noted that – while evidence of prior conduct is not

19  admissible to prove the conduct of the accused on the specified occasion – prior conduct

20  evidence *is* properly admitted to establish some fact other than a person's character or disposition

21  such as intent or common scheme and plan.  Ex. D at 25, *citing* Cal. Evid. Code § 1101(a),(b).

22  The Fifth DCA then analyzed admission of the evidence under California law and due process.

23  The court noted the many similarities between the charged incident and the prior incident, and

24  the close proximity of the events.  Ex. D at 27-28.  Petitioner had asserted a defense on the

25  ground that the girls were voluntarily prostituting themselves at the motel, and had denied

26  ongoing membership in the MBS gang.  The court found that this evidence was highly probative

27  both as a counter to the voluntary prostitution defense and to establish Petitioner's ongoing gang

28  membership.  It tended to show an established plan or scheme where MBS gang members

ed

1   conspired to commit sexual offenses for the benefit of the gang.  Id.  The court also found that

2   any prejudice was minimal, as the evidence was no more inflammatory than the charged

3   offenses.  For these reasons, the Fifth DCA found that the probative nature of the evidence in

4   question outweighed any potential prejudice.

5         3.       Analysis of Petitioner's Claim

6         Generally, the admissibility of evidence is a matter of state law, and is not appropriate for

7   federal habeas corpus review.  Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated

8   many times that 'federal habeas corpus relief does not lie for errors of state law.'"), *quoting*

9   Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993)

10  (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a

11  constitutional violation, may not be corrected on federal habeas"); Tinsley v. Borg, 895 F.2d 520,

12  530 (9th Cir. 1990), *cert. denied*, 498 U.S. 1091 (1991) ("incorrect" evidentiary rulings are not the

13  basis for federal habeas relief)..

14        Petitioner asserts that the introduction of evidence of other bad acts is impermissible

15  under McKinney v. Rees, 993 F.2d 1378, 1380-1385 (9th Cir. 1993), and Michelson v. United

16  States, 335 U.S. 469, 475-76 (1948).  However, these cases are inapposite.  Michelson simply

17  states the general rule, since codified in the Federal Rules of Evidence (Rule 404), that evidence

18  of prior acts is not permissible if used to demonstrate mere propensity.  Similarly, McKinney

19  holds that "the use of 'other acts' evidence *as character evidence* is not only impermissible under

20  the theory of evidence codified in the California rules of evidence...and the Federal Rules of

21  Evidence...but is contrary to firmly established principles of Anglo-American jurisprudence."

22  993 F.2d at 1380 (emphasis added).  These cases do not address a case such as this, where the

23  evidence was admitted for some other legitimate purpose (to refute Petitioner's denial of gang

24  affiliation and defense of voluntary prostitution, as well as to show common scheme and plan).

25        Indeed, both the California and Federal Rules of Evidence explicitly *permit* the

26  introduction of such evidence.  Cal. Evid. Code § 1101(b); Fed. Rules Evidence 404(b).  It is a

27  "widely recognized principle that similar but disconnected acts may be shown to establish intent,

28  design, and system."  Lisenba v. California, 314 U.S. 219 (1941) (citing Wigmore, Evidence, 3d.

ed

1  Ed., Vol. II, § 363).   Moreover, the alleged error here does not rise to the level of a

2  constitutional violation.  As discussed by the Fifth DCA, the evidence in question was highly

3  probative on issues related to both Petitioner's gang identity and his defense that the victims had

4  voluntarily prostituted themselves.  Nor was this probative value substantially outweighed by the

5  danger of prejudice, confusion of the issues, or misleading the jury, as the evidence was no more

6  inflammatory than the offenses with which Petitioner was charged.

7      The state appellate court's rejection of this claim was neither contrary to nor an

8  unreasonable application of established Federal law.  Nor was it an unreasonable determination

9  of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d).  Therefore Petitioner's

10  claim is denied.

11      **C.     Ground Three – Improper Exclusion of Witness Testimony**

12         1.     Factual Background

13      Petitioner claims that the trial court erred by excluding the testimony of a defense witness

14  on the basis that the witness' assertion of his Fifth Amendment privilege left the prosecution with

15  insufficient ability to cross-examine him.  He argues that this exclusion deprived him of his

16  rights to due process, a fair trial, to present evidence, and compulsory process.

17      The court adopts the facts as related by the Fifth DCA:

18         During a foundational hearing under (Cal.) Evidence Code section 402,
    Sim testified on direct examination that the police released him from the Motel 6
19      to defendant's custody early in the morning on Tuesday, April 7, 1998.  Sim had
    been at the motel since Monday evening, and testified defendant had not been
20      present.  Sim denied he had "pimped" Maney and denied that defendant was in the
    gang with him.  Sim also claimed Maney was prostituting herself.  On cross-
21      examination, Sim admitted he hung out with defendant once in awhile.  However,
    when asked whether he had been at the motel the weekend before, Sim asserted
22      his Fifth Amendment privilege.  Sim also refused to answer questions regarding
    what he told his ex-girlfriend, Anna Vang, about the weekend of April 6th.  The
23      prosecutor made an offer of proof that Anna Vang's diary indicated Sim had told
    her "they pimped Maney" on the weekend of April 6th.  The prosecutor also
24      indicated that the evidence they had of Sim's association with defendant was the
    incident on the weekend of March 26th.
25
        The court determined Sim's assertions of his right against self-
26      incrimination severely restricted the prosecutor's ability to cross-examine on
    important issues in the case....
27
        The court made it clear to defense counsel that it's ruling was based on the
28      current status of the case, and stated, "I am prepared to change that if [either] the

1    witness [] changes his position on testifying as to those important points, or you
2    bring me case authority which indicates [a more appropriate] remedy...."  Defense
     counsel noted he had no other authority, and when he interviewed Sim in the
3    presence of his attorney, "it appeared he was going to speak freely about the
     events on the 4th, 5th, and 6th."  Defense counsel then focused on preventing Anna
4    Vang's testimony and excluding her diary entries, which could severely damage
     the defense theory that the victims were freely prostituting themselves.
5    Afterward, defense counsel did not offer any solutions or request a different
     remedy for the problem posed by Sim's unwillingness to speak freely about the
6    events on the 4th, 5th, and 6th.

7           2.      State Court Review

8           Defendant appealed to the Fifth DCA, claiming that the trial court had improperly held

9    that Sim retained his privilege against self-incrimination and excluded his testimony.  The Fifth

10   DCA rejected Petitioner's claims.  It first noted that the court had *not* in fact ruled that Sim

11   retained his privilege.  It had simply ruled that a witness cannot refuse to answer questions on

12   cross-examination that are within the scope of questions answered on direct examination.

13   Petitioner retained the option to ask the court to compel Sim to testify, at the risk his testimony

14   might be stricken.  Defense counsel chose not to exercise that option Ex. D at 35 ("It is evident

15   defense counsel made the wise tactical choice to forego Sim's testimony.").  The Fifth DCA then

16   held that, even assuming the trial court *had* ruled that Sim had a valid privilege, any error was

17   waived by virtue of the fact that Petitioner failed to object to the assertion of privilege at trial.  Id.

18   at 37 ("Defendant did not argue or contend Sim could not validly assert the privilege, and does so

19   for the first time on appeal.  Generally a theory of error for exclusion of evidence cannot be made

20   for the first time on appeal, and the matter is deemed waived.").  Finally, the state appellate court

21   held that even assuming the trial court had ruled on Sim's privilege and that Petitioner had not

22   waived error, Petitioner failed to show error in the court's so ruling.  The court noted that Sim

23   had charges pending on similar conduct, and it was logical for Sim to conclude that his testimony

24   could possibly be used against him in his upcoming trial.

25          3.      Analysis of Petitioner's Claim

26          Because Petitioner failed to timely object to the exclusion of Sim's testimony at trial, this

27   Court will not review Petitioner's claim.  Federal courts "will not review a question of federal

28   law decided by a state court if the decision of that court rests on a state law ground that is

1  independent of the federal question and adequate to support the judgment." Coleman v.

2  Thompson, 501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  If

3  the court finds an independent and adequate state procedural ground, "federal habeas review is

4  barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice,

5  or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of

6  justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park

7  v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

8      Here, the Court of Appeal, on direct review, held that Petitioner had waived his claim by

9  failing to object at the sentencing hearing. Ex. D at 37.  Thus, the Court of Appeal applied the

10  contemporaneous objection bar.  This Court finds that the contemporaneous objection rule is

11  applied independent of federal law.  See Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir.

12  1999) (recognizing and applying California's contemporaneous objection rule in affirming denial

13  of a federal petition on the ground of procedural default); Bonin v. Calderon, 59 F.3d 815, 842-

14  43 (9th Cir. 1995) (sustaining the state court's finding of procedural default where defendant

15  failed to make any objection at trial).  This Court further finds that the contemporaneous

16  objection rule is also "adequate."  California Courts have consistently applied the

17  contemporaneous objection rule.  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) ("We

18  held more than twenty years ago that the rule is consistently applied when a party has failed to

19  make any objection to the admission of evidence.") (citing Garrison v. McCarthy, 653 F.2d

20  374,377 (9th Cir. 1981); Vansickel v. White, 166 F.3d at 957-58; Bonin v. Calderon, 59 F.3d at

21  842-43).

22      Petitioner has made no attempt to demonstrate cause and prejudice or that a miscarriage

23  of justice will result should the Court not consider the claim.  Accordingly, the Court rejects

24  Petitioner's claim as procedurally barred.

25      **D.      Ground Four – Improper Jury Instructions**

26      1.      Factual Background

27      Petitioner claims the trial court erred by failing to give certain clarifying instructions

28  regarding the in-concert and force elements of Cal. Penal Code section 264.1.  Petitioner argues

1   that (1) the instructions improperly directed the jury to make an in-concert finding if it found

2   defendant was an aider and abettor; and (2) the court was obligated to define "force" as used in

3   the instructions.

4       At the conclusion of trial, the trial court instructed the jury with CALJIC No. 10.01.[2]

5   Petitioner neither objected to this instruction nor requested any clarifying instructions be given.

6       2.      State Court Review

7       Petitioner's improper jury instruction claim was first raised in his appeal to the Fifth

8   DCA.  The state appellate court denied the claim.  The court first held that Petitioner had waived

9   any claim of defect in this jury instruction by failing to object or to request clarifying

10  instructions.  Ex. D at 18, 23.  The court further found that CALJIC 10.01 was a correct

11  _____

12  [2]CALJIC 10.01, as given by the trial court, provides:
           The defendant [is] accused [in Count[s] [2 & 5] of having committed the crime of rape by
13  acting in concert in violation of section 264.1 of the Penal Code.
           Every person who voluntarily acting in concert with another person by force or violence
14  and against the will of the victim [personally] [or] [by aiding and abetting the other person]
    commits the crime of rape as defined in these instructions, is guilty of the crime of rape by acting
15  in concert in violation of Penal Code section 264.1.
           The phrase "acting in concert" means two or more persons acting together in a group
16  crime and includes not only those who personally engage in the act constituting the crime but also
    those who aid and abet a person in accomplishing it.  To establish that a defendant voluntarily
17  acted in concert with another person, it is not necessary to prove there was any prearrangement,
    planning or scheme.
18         "Against the will of the victim" means without the consent of the alleged victim.
           [It is not necessary that a person who aids and abets the perpetrator have physical contact
19  with the victim.]
           In order to prove this crime, each of the following elements must be proved:
20         1.  A person committed the crime of rape
           2.  That person did so while voluntarily acting in concert with another person; and
21         3.  The defendant [personally] [or] [by aiding and abetting another person] committed the
    rape by force or violence and against the will of the alleged victim"
22  _____

    The court instructed on aiding and abetting as follows:
23         A person aids and abets the [commission] [or] [attempted commission] of a crime when
    he or she,
24         1.  With knowledge of the unlawful purpose of the perpetrator and
           2.  With the intent or purpose of committing or encouraging or facilitating the commission
25  of the crime, and
           3.  By act or advice aids, promotes, encourages or instigates the commission of the crime.
26         [A person who aids and abets the [commission] [or] [attempted commission] of a crime
    need not be present at the scene of the crime.]
27         [Mere presence at the scene of a crime which does not itself assist the commission fo the
    crime does not amount to aiding and abetting.]
28         _____[Mere knowledge that a crime is being committed and the failure to prevent it does not
    amount to aiding and abetting.]

ed

1   instruction on the law and responsive to the evidence, and that the trial court was not under an

2   obligation to provide clarification *sua sponte* on the term "force," as it did not have a technical

3   definition in the context of Cal. Penal Code §264.1.  Finally, the Fifth DCA held that, even

4   assuming that (a) the instructions were in error, and (b) the error was not waived, Petitioner was

5   nonetheless not entitled to relief because any error was harmless.  The court noted the

6   "overwhelming evidence of force and violence used during the gang assaults," and the "ample

7   evidence...that defendant was present and participated personally in a sexual assault."  Ex. D at

8   23.  In light of this evidence, the court found that "it is not reasonably probable defendant would

9   have received a more favorable outcome" if clarifying instructions on "force" and the distinction

10   between aiding and abetting and in-concert participation were given.  Id.

11           3.        Analysis of Petitioner's Claim

12           The Court finds Petitioner's claim to be without merit.  First, to the extent it is based on

13   the interpretation of state law these claims are not cognizable on federal habeas corpus review.

14   Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas

15   corpus relief does not lie for errors of state law.'"), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780

16   (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error

17   of state law, one that does not rise to the level of a constitutional violation, may not be corrected

18   on federal habeas").  The 5th DCA ruled that the instructions used in this case were entirely

19   correct under state law.  Federal courts are bound by state court rulings on questions of state law.

20   Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).

21           Moreover, review by this Court is inappropriate in light of Petitioner's failure to timely

22   object at trial.  *See* discussion, *supra*, section C(3) at 15-16.  Federal courts "will not review a

23   question of federal law decided by a state court if the decision of that court rests upon a state law

24   ground that is independent of the federal question and adequate to support the judgment."

25   Coleman v. Thompson, 501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th

26   Cir. 2001).  If the court finds an independent and adequate state procedural ground, "federal

27   habeas review is barred unless the prisoner can demonstrate cause for the procedural default and

28   actual prejudice, or demonstrate that the failure to consider the claims will result in a

1  fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-05 (9th Cir. 1993);

2  Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

3      Here, the Fifth DCA, on direct review, held that Petitioner had waived his jury instruction

4  claims by failing to object. Ex. D at 18, 23. Thus the state court of appeal applied the

5  contemporaneous objection bar. This Court finds that the contemporaneous objection rule is

6  applied independent of federal law. See Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir.

7  1999)(recognizing and applying California's contemporaneous objection rule in affirming denial

8  of a federal petition on the ground of procedural default); Bonin v. Calderon, 59 F.3d 815, 842-

9  43 (9th Cir. 1995) (sustaining the state court's finding of procedural default where defendant

10  failed to make any objection at trial). Further, as Respondent submits, and this Court finds, the

11  contemporaneous objection rule is also "adequate." California Courts have consistently applied

12  the contemporaneous objection rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002)

13  ("We held more than twenty years ago that the rule is consistently applied when a party has failed

14  to make any objection to the admission of evidence.")(citing Garrison v. McCarthy, 653 F.2d

15  374, 377 (9th Cir. 1981); Vansickel v. White, 166 F.3d at 957-58; Bonin v. Calderon, 59 F.3d at

16  842-43.

17      Petitioner has made no attempt to demonstrate cause and prejudice or that a miscarriage

18  of justice will result should the Court not consider the claim. Accordingly, the Court rejects

19  Petitioner's claim as procedurally barred.

20                    **E.     Ground Five – Jury Instructions (Directed Verdict)**

21          1.     Factual Background

22      In his fifth ground for relief, Petitioner claims the "in concert participation" instructions

23  violated his right to due process and trial by jury by directing the jury to make an in concert

24  finding if it found that Petitioner aided and abetted the sexual offenses committed by others.

25  (Pet. Att; Ex. E at 11)

26          2.     State Appellate Review

27      The Fifth DCA rejected Petitioner's contention that Jury instruction 10.01 directed an "in

28  concert" finding if aiding and abetting was established. The court found that Petitioner's reading

of the jury instruction was incomplete, and that a full reading did not support his contention of

directed verdict on the issue of "in concert" participation:

> Defendant parses the instruction in an attempt to show it is theoretically possible the instruction could be applied to a person who aided and abetted the crime but did not act in the group crime. However, read as a whole, the instruction requires that the person either personally or as an aider and abettor, "voluntarily act[] in concert with another person by force or violence and against the will of the victim[.]" (CALJIC No. 10.01). As further defined, " 'acting in concert' means two or more persons *acting together in a group crime....*" (CALJIC No. 10.01; see *People v. Calimee* (1975) 49 Cal.App.3d 337, 341).

Ex. D at 24. Moreover, the court found that any error was harmless – there was no reasonable

possibility that the jury was mislead or misapplied the jury instruction in this case, as defendant

not only aided and abetted others by his presence in the hotel room, but also participated in a

rape. Id.

> 3.      Analysis of Petitioner's Claim

Due Process denies the state the power to deprive the accused of liberty unless it proves

beyond a reasonable doubt every element of the charged offense. Carella v. California, 491 U.S.

263, 265-66 (1989), *citing* In re Winship, 397 U.S. 358, 364 (1970). Jury instructions that

relieve states of this burden violate defendant's due process rights by subverting the presumption

of innocence and invading the truth-finding province of the jury. Id., *citing* Francis v. Franklin,

471 U.S. 307 (1985) *and* Sandstrom v. Montana, 442 U.S. 510 (1979). An instruction which

creates a mandatory presumption – one which "both alone and in the context of the overall

charge, could have been understood by reasonable jurors to require them to find the presumed

fact if the State proves certain predicate facts" – is constitutionally defect. However, this error is

subject to the harmless error rule. Id.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Additionally, the instruction may not be

judged in artificial isolation, but must be considered in the context of the instructions as a whole

and the trial record. Id. The court must evaluate jury instructions in the context of the overall

charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S.

ed

1   152, 169 (1982), *citing* Henderson v. Kibbe, 431 U.S. 145, 154 (1977).  Furthermore, even if it is

2   determined that the instruction violated the petitioner's right to due process, a petitioner can only

3   obtain relief if the unconstitutional instruction had a substantial influence on the conviction and

4   thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

5   (whether the error had a substantial and injurious effect or influence in determining the jury's

6   verdict); see also Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

7          In this case there is nothing in the record which supports Petitioner's claim.  Petitioner

8   fails to point to any authority supporting his position that CALJIC 10.01 directs an "in concert"

9   verdict solely on the basis of aiding and abetting.  Nor has Petitioner demonstrated that the jury

10  instruction "so infected the entire trial that the resulting conviction violates due process."

11  Estelle, 502 U.S. at 72.  Indeed, as noted by the Fifth DCA, there was ample evidence for the jury

12  to find that Petitioner was an in concert participant in the sexual assault.  Petitioner was not an

13  absentee aider and abettor, but was present in the hotel room and personally participated in

14  raping one of the victims.  For these reasons, Petitioner's claim is denied.

15        **F.      Ground Six – Jury Instructions (Evidence of Prior Crimes)**

16              1.      Factual Background

17         Petitioner challenges the instructions given to the jury regarding the consideration of

18  evidence of other crimes to prove common plan under Cal. Evid. Code section 1101(b).

19  Petitioner claims that the instruction permitted the jury to convict him on the sole basis of prior

20  crimes proved by preponderance of the evidence, in violation of due process.  At the close of

21  trial, the trial court instructed the jury regarding evidence of prior crimes pursuant to CALJIC

22  Nos. 2.50, 2.50.1, and 2.50.2.[3]  Petitioner timely objected to the instructions.

23              2.      State Court Review

24         The Fifth DCA rejected petitioner's claim regarding these jury instructions.  Citing

25  People v. Medina (1995) 11 Cal.4th 694 and People v. Carpenter (1997) 15 Cal.4th 312, The

26

27         [3]CALJIC 2.50 states "evidence of other crimes has been admitted to show a characteristic method, plan or
    scheme; it may not be considered to show bad character or criminal disposition."  CALJIC 2.50.1states  "evidence of
28  another crime may not be considered unless the jury finds defendant committed such a crime by a preponderance of
    the evidence."  CALJIC 2.50.2 defines "preponderance of the evidence."

ed                                                    21

state appellate court stated that "a preponderance of evidence standard has long been applied

when determining the truth of evidence of other crimes as circumstantial evidence of intent or

motive.  Evidence of other crimes is a mere 'evidentiary fact' that need not be proven beyond a

reasonable doubt as long as the jury is convinced beyond a reasonable doubt of the truth of the

'ultimate fact' of the defendant's knowledge or intent...." Ex. D at 29-30.  The court went on to

find:

> [E]ach case starts with the premise that a criminal has a due process right to have
> each fact necessary to the conviction proven beyond a reasonable doubt.  The
> cases merely recognized that: (1) this burden was not diminished by an instruction
> that other crime evidence need only be proven by a preponderance of the
> evidence, and (2) when CALJIC Nos. 2.50 and 2.50.1 are viewed in context with
> CALJIC Nos. 2.90 and 2.01, it is not reasonably likely that the jury found the
> necessary elements of the charged offense true on a standard less than beyond a
> reasonable doubt. [citations omitted].

Id. at 30.

### 3.    Analysis of Petitioner's Claim

This Court's review is limited to determining whether the state court unreasonably

applied clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1); Delgado v. Lewis, 223

F.3d at 979-80.  Constitutional Due Process requires that the State prove all elements of the

offense charged and all facts necessary to establish each of those elements beyond a reasonable

doubt.  See Sullivan v. Louisiana, 508 U.S. 275, 277-278; U.S. Const., amends. V, VI, XIV.

Evidence of past crimes is not admissible for the purpose of demonstrating defendant's bad

character or criminal disposition.  See, e.g. Fed. Rules Evidence Rule 404(a).  However, evidence

of other acts may be admitted for some other legitimate purpose, such as to demonstrate

knowledge, intent, or common plan or scheme.  See, e.g. Id., Rule 404(b).  Similar act evidence

is relevant only if the jury can reasonably conclude that the act occurred and that the defendant

was the actor.  Huddleston v. United States, 485 U.S. 681, 689 (1988).

This evidence of prior acts need not be proven beyond a reasonable doubt – proof by a

preponderance of the evidence is sufficient.  Estelle v. McGuire, 502 U.S. 62, 73-74 ("To the

extent that the jury may have believed McGuire committed the prior acts and used that as a factor

in its deliberation, we observe that there was sufficient evidence to sustain such a jury finding *by

a preponderance of the evidence."* (emphasis added) (citing Huddleston, 485 U.S. at 690); See

ed

1   also Bourjaily v. United States, 483 U.S. 171, 176 (1987); see also Dowling v. United States, 493

2   U.S. 342, 348 (1990) (evidence of prior acts for which defendant had been acquitted in previous

3   criminal trial allowed in subsequent civil trial on preponderance standard).  Where evidence of

4   prior acts is admitted, however, the court should give a limiting instruction informing the jury of

5   the narrow purpose for which it has been admitted.  United States v. Bradshaw, 690 F.2d 704 (9th

6   Cir. 1982), cert. denied 463 U.S. 1210.  Proper limiting instructions can reduce or eliminate

7   prejudice which would otherwise occur.  United States v. O'Brien, 601 F.2d 1067, 1070 (9th Cir.

8   1979).  The adequacy of jury instructions is determined by examining them in their entirety.

9   Estelle v. McGuire, 502 U.S. 62, 72 (1991).

10          This Court cannot find that the state courts' decisions are contrary to or unreasonable

11   apply relevant Supreme Court precedent.  The cases cited by Petitioner correctly state the general

12   rule that the State must prove all elements of the offense charged, and must persuade the finder

13   of fact "beyond a reasonable doubt" of the facts necessary to establish each of those elements.

14   See e.g. Sullivan v. Louisiana, 508 U.S. 275, 278 (1993).  However, in the cases cited by

15   Petitioner, the trial courts' instructions impermissibly shifted the burden of persuasion on an

16   element of the offense.  See, e.g. Francis v. Franklin, 471 U.S. 307 (1985).  Here, the instruction

17   in question did not lessen the State's burden on any element of the offenses charged.  Instead,

18   they specifically limited the jury's consideration of the evidence of Petitioner's prior acts to

19   "establish[ing] characteristic method, plan or scheme."  CALJIC 2.50.  Petitioner fails to cite any

20   authority in support of his contention that evidence offered for such purposes must be proven by

21   anything beyond a preponderance standard.  Indeed, such an interpretation of due process is

22   foreclosed by the Supreme Court's holdings in Estelle, Huddleston and Bourjaily.  Consequently,

23   Petitioner's claim is denied.

24          **G.      Ground Seven – Jury Instruction (Witness Credibility)**

25              1.      Factual Background

26          Citing Amendments Five and Fourteen to the United States Constitution, Petitioner

27

28

ed

1    argues that CALJIC No. 2.21.2,[4] authorizing the jury to evaluate witness credibility on a

2    probability standard, violated his due process rights to proof beyond a reasonable doubt of his

3    guilt.  Ex. E at 14-15.

4            2.        State Appellate Review

5            Petitioner first raised this claim on direct appeal to the Fifth DCA.  On August 11, 2001,

6    the appellate court rejected Petitioner's claim, holding  that CALJIC No. 2.21.2 has "consistently

7    been held to be a statement of law and appropriately given when there is an evidentiary basis to

8    support it."  (Ex. D at 39).  The Fifth DCA noted that – in light of instructions given to the jury

9    on the presumption of innocence, the "beyond a reasonable doubt" standard, the duty to base its

10   decision on consideration of all the evidence, and the duty to consider all instructions as a whole

11   – the instruction on witness credibility did not work to lessen the prosecutor's burden of proof

12   beyond the required "reasonable doubt" standard.

13           3.        Analysis of Petitioner's Claim

14           This Court's review is limited to determining whether the state court unreasonably

15   applied clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1); Delgado v. Lewis, 223

16   F.3d at 979-80.  Admission of evidence and instructions of state law are a state law concern, not

17   cognizable in federal habeas proceedings unless the state trial court's decision is error rising to

18   the level of a due process violation.  Estelle v. McGuire, 502 U.S. at 67.  Constitutional Due

19   Process requires that the State prove all elements of the offense charged and all facts necessary to

20   establish each of those elements beyond a reasonable doubt.  See Sullivan v. Louisiana, 508 U.S.

21   275, 277-278; U.S. Const., amends. V, VI, XIV.  In evaluating jury instructions, the federal court

22   looks to the context of the overall charge to the jury as a component of the entire trial process to

23   determine whether the instructions in question so infected the entire trial process such that the

24   resulting conviction violates due process rendering the trial fundamentally unfair.  Id. at 72; see

25   also United States v. Frazin, 780 F.2d 1461, 1468 (9th Cir), cert. denied 479 U.S. 844 (1986).

26

27   _____
        [4] CALJIC No. 2.21.2 reads as follows:

28           "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others.
     You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless,
     from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

1   This Court rejects Petitioner's claim.  Viewed in context, it cannot be said that CALJIC

2   2.21.2 "by itself so infected the entire trial that the resulting conviction violates due process."

3   Estelle, 502 U.S. at 72 (*quoting* Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  Petitioner must

4   establish that "'there is a reasonable likelihood that the jury has applied the challenged

5   instruction in a way' that violates the constitution."  Id. (*quoting* Boyde v. California, 494 U.S.

6   370, 380 (1990)).  When viewed in the context of the instructions as a whole, the willfully false

7   witness instruction did not render Petitioner's conviction constitutionally invalid.  The

8   instruction applied to all witnesses, and did not single out Petitioner.

9   Moreover, the text of the willfully false witness instruction itself undermines Petitioner's

10   argument.  It specifically instructs the jury that it may choose to believe some of the testimony of

11   a witness it finds to be willfully false.  Because the jury "remained free to exercise its collective

12   judgment to reject what it did not find trustworthy or plausible," the instruction could not be

13   applied in a way that challenged the constitution.  Cupp, 414 U.S. at 149.

14   For the above reasons, Petitioner's claim with respect to CALJIC 2.21.2 is denied.

15   **H.    Ground 8 – Cumulative Error**

16   1.    Factual Background

17   Petitioner claims that the cumulative impact of errors at trial denied him his constitutional

18   right to due process and a fair trial.  Ex. E at 16.

19   2.    State Court Review

20   Petitioner first asserted this claim before the Fifth DCA.  The state appellate court

21   rejected Petitioner's claim, stating:

22   In a separately headed argument, defendant also argues the cumulative
    effect of the alleged trial errors discussed above deprived him of a fair trial.

23   (*People v. Ryner* (1985) 164 Cal.App.3d 1075, 1087; *People v. Williams* (1971)
    22 Cal.App.3d 34, 40, 58).  However, since we have rejected defendant's various

24   claims of error, it follows there could be no "cumulative effect of errors" in this
    case.  (People v. Pride (1992) 3 Cal.4th 195, 269).

25   3.    Analysis of Petitioner's Claim

26   The cumulative impact of errors at trial may result in a violation of due process entitling a

27   petitioner to federal habeas relief.  Taylor v. Kentucky, 436 U.S. 478, 487, n.15  (1978) ("the

28   cumulative effect of the potentially damaging circumstances of this case violated the due process

1 guarantee of fundamental fairness...."); ( Rose v. Lundy, 455 U.S. 509, 531, n. 8 (1982)

2 ("Conceivably, habeas relief could be justified only on the basis of a determination that the

3 cumulative impact of the four alleged errors so infected the trial as to violate respondent's due

4 process rights."); United States v. Tucker, 716 F.2d 576, 595 (9th Cir. 1983) ("a court may find

5 unfairness – and thus prejudice – from the totality of counsel's errors and omissions.").

6 However, this is not a case where there have been a series of errors which aggregate to a

7 violation of Due Process. Here, the Fifth DCA correctly held that each of Petitioner's claims of

8 error was invalid. Because this Court concurs with the judgment of the state appellate courts as

9 to these individual claims of error, it likewise agrees that there can be no cumulative error of

10 Constitutional magnitude.

11 **I.     Ground 9 – Sentencing under Cal. Penal Code section 667.6**

12      1.     Factual Background

13 Petitioner's Ninth count alleges that the trial court improperly sentenced him under Cal.

14 Penal Code § 667.6 on a number of counts. He contends that it was improper for the court to

15 impose sentence pursuant to § 667.6(c) on counts 8 (oral copulation in concert) and 12 (sodomy

16 in concert) and pursuant to § 667.6(d) on counts 5 (rape in concert) and 8 (oral copulation in

17 concert).

18 Following his conviction, the trial court sentenced petitioner pursuant to Cal. Pen. Code

19 §667.6(c) to full consecutive terms for count 8 and count 12. The trial court likewise sentenced

20 Petitioner to full consecutive terms under Cal. Pen. Code §667.6(d) on counts 5 and 8.

21      2.     State Appellate Review

22      a.     The Fifth DCA

23 Petitioner appealed his sentencing under Penal Code sections 667.6 (c) and (d) to the

24 Fifth DCA as follows:

25           i.     Counts 8 and 12 (Cal. Pen. Code §667.6(c))

26 Petitioner contended with respect to these two counts that 667.6 was inapplicable because

27 the jury's determination of his guilt may have been predicated on the theory of threat of future

28 harm. Petitioner argued that while sections 288(a) (oral copulation in concert) and 286(d)

(sodomy in concert) permit conviction "where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim," section 667.6 only covers crimes that are achieved on the basis of threat of *immediate* harm.  Petitioner asserted that it was sufficiently uncertain whether the verdicts rested upon immediate or future conditional threats, and that therefore 667.6 sentencing was improper.

The Fifth DCA rejected Petitioner's claim, finding that the language of the verdict itself[5] did not support Petitioner's claim of uncertainty as to the immediacy of the threatened harm.  Ex. D at 41.  The appellate court also found that the jury's verdicts on other counts demonstrated that the jury could not have convicted Petitioner based on a theory of future retaliation.  Id.

> As discussed earlier, the jury found the in-concert rape counts were committed by means of force or violence.  No instructions permitted these convictions based on a threat of future retaliation.  It is inconceivable the jury could rationally find the rapes were committed by force or violence but that the other crimes, specifically the in-concert sodomy and oral copulation, were committed by means of threat of future retaliation.  For example, consider the rape and oral copulation of Kaoying by Balloon.  The rape perpetrated by Balloon followed defendant's rape of Kaoying.  After the rape, Balloon tricked Kaoying into taking a shower with him.  During this time, Balloon physically pushed Kaoying down by her shoulders and forced her to commit an act of oral copulation.  It is not reasonably possible the jury could find Balloon's rape was by means of force or violence, but the oral copulation that immediately followed was by a threat of future retaliation.  Rather, the jury must be deemed to have made a finding the oral copulation and sodomy were committed by means of force or violence within the meaning of section 667.6 when it rendered its verdicts.  (People v. Ashmus  54 Cal.3d 932, 1011 (1991)).

Id. at 41-42.

      ii.    Counts 2 and 5 (Cal. Pen. Code § 667.6(d))

With respect to counts 2 and 5, Petitioner contended that the trial court erred by imposing mandatory consecutive sentences pursuant to Penal Code section 667.6(d).  He argued that, because the physical acts were committed not by Petitioner but by another person (Balloon), it would be unfair to impute to Petitioner an opportunity to reflect upon acts committed by this other person.  Petitioner further argued that the record did not support a finding of opportunity to reflect on the part of Balloon because there was no evidence of a concrete break in activity or

---

[5]In relevant part, the verdict states "BY MEANS OF FORCE, VIOLENCE, DURESS, MENACE, OR FEAR OF THE IMMEDIATE BODILY INJURY OF [THE VICTIM]...."

ed

course of conduct.

The Fifth DCA rejected Petitioner's claim.  It first noted that the argument that it is "unfair" to apply section 667.6(d) liability for one who's liability is derivative as an aider and abettor is a matter for the Legislature.  As written, section 667.6(d) specifically includes the offenses for which Petitioner was convicted, and nothing in its legislative history indicates a legislative intent to require that defendant personally commit one of the listed sexual offenses to be subject to full and consecutive sentencing.  Ex. D at 42-43, *citing* People v. Farr, 54 Cal.App.4th 835, 845 (1997).

The Fifth DCA went on to find that there was sufficient evidence of "separate occasions" to support sentencing under section 667.6(d).  First, with respect to count 2 (Balloon's rape of Kaoying), the court noted that the rape occurred subsequent to Petitioner raping the victim.  The change in attackers constituted a "separate occasion" under section 667.6(d).  Ex. D at 43-44, *citing* People v. McPherson, 86 Cal.App.4th 527, 530 (2001).  With respect to count 5 (Balloon's oral copulation of Kaoying), the Fifth DCA found as follows:

> The evidence supports the court's implied finding that the oral copulation occurred on a "separate occasion."  After Balloon raped Kaoying on the floor, he told her to take a shower with him, promising nothing else would happen.  In the shower, Balloon tried to get Kaoying to bend over, but she refused.  Balloon then pushed her down by her shoulders and forced her into an act of oral copulation.  These facts demonstrate that after raping Kaoying, Balloon "had a reasonable opportunity to reflect upon his...actions and nevertheless resumed sexually assaultive behavior."  (§ 667.6(d)).  Balloon changed locations from the floor to the shower by cajoling Kaoying into changing locations.  He then attempted to commit either another rape or an act of sodomy of Kaoying in a bent over, standing position.  When this attempt failed because she would not cooperate, Balloon resumed his sexual assault by forcing Kaoying down towards his penis for an act of oral copulation.  (People v. Irvin, 43 Cal.App.4th 1063, 1071 (1996)).

Ex. D at 44.

### b.    The State Supreme Court

Following the rejection of his appeal by the Fifth DCA, Petitioner appealed to the California Supreme Court.  In addition to reiterating the arguments made to the state appellate court, Petitioner also added the following argument: "the determination that the offenses rested upon qualifying grounds under section 667.6 must be made beyond a reasonable doubt; the absence of any determination beyond a reasonable doubt constitutes federal constitutional error."

1   Ex. E at 18, *citing* U.S. Const. Amend. 5; Apprendi v. New Jersey, 530 U.S. 466 (2000).  The

2   state supreme court denied review on November 14, 2001.

3          3.      Analysis

4          Federal habeas corpus review is limited to determining whether the state court's decision

5   "was contrary to, or involved an unreasonable application of, clearly established Federal law, as

6   determined by the Supreme Court of the United States" or "resulted in a decision that was based

7   on an unreasonable determination of the facts in light of the evidence presented in the State Court

8   proceeding." 28 U.S.C. § 2254(d); *see* Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

9          A criminal defendant is entitled to "a jury determination that [he] is guilty of every

10  element of the crime with which he is charged, beyond a reasonable doubt." United States v.

11  Gaudin, 515 U.S. 506, 510 (1995) (*citing* U.S. Const. Amend. V, VI).  Any fact other than prior

12  conviction that increases the maximum penalty for a crime must be charged in an indictment,

13  submitted to a jury, and proved beyond a reasonable doubt.  Jones v. United States, 526 U.S. 227,

14  243, n. 6 (1999).  The Fourteenth Amendment makes the same rule applicable with regard to

15  state criminal statutes.  Apprendi v. New Jersey, 530 U.S. 466, 476 (2000).

16         a.      Counts 8 and 12 (Cal. Pen. Code § 667.6(c))

17         Petitioner argues that because the convictions *could* have been predicated on facts (the

18  threat of future harm) not covered by section 667.6(c), sentencing under 667.6(c) was

19  inappropriate.  This Court rejects Petitioner's claim.  First, the decision of the state court was not

20  an unreasonable determination of the facts in light of the evidence presented in the State Court

21  proceeding. 28 U.S.C. § 2254(d).  As the Fifth DCA found, while a conviction for the offenses

22  in question might be based on the threat of future harm, *Petitioner's* conviction was not.  The

23  very language of the jury verdict indicates, Petitioner was convicted on counts 8 and 12 "BY

24  MEANS OF FORCE, VIOLENCE, DURESS, MENACE, OR FEAR OF THE *IMMEDIATE*

25  BODILY INJURY OF [THE VICTIM]...." (emphasis added).  Thus the very language of the

26  verdict places Petitioner's crimes within section 667.6(c).  Moreover, the Fifth DCA's finding

27  that the jury could not have convicted Petitioner on a theory of future violation is not

28  unreasonable in light of the jury's determination that other offenses – committed during the same

1   sequence of events – *were* committed by the use of force or violence.

2          Moreover, the Fifth DCA's opinion is not contrary to clearly settled Supreme Court law.

3   Petitioner cites Apprendi v. New Jersey in support of his claim.  In Apprendi, the Supreme Court

4   held invalid a New Jersey penal statute that permitted a judge to base sentence enhancement on

5   findings made by the judge under a preponderance of the evidence standard.  The Supreme Court

6   held that – with the exception of prior convictions – any facts resulting in an enhancement

7   beyond the statutory maximum required jury findings beyond a reasonable doubt.  Apprendi, 530

8   U.S. at 494-95.

9          The findings of the Fifth DCA are not contrary to this holding.  As the DCA notes,

10  Petitioner was convicted upon jury findings beyond a reasonable doubt that he committed these

11  acts of sexual assault "by means of force, violence, duress, menace, or fear of the immediate

12  bodily injury of [the victim]...."  And the jury's verdicts on related charges stemming from the

13  same sequence of events were based on the use of force or violence.  "It is inconceivable the jury

14  could rationally find the rapes were committed by force or violence but that the other crimes,

15  specifically the in-concert sodomy and oral copulation, were committed by means of threat of

16  future retaliation."  Ex. D at 41.  Petitioner's convictions on counts 8 and 12 were based on the

17  jury's determination of the use of force, violence, or immediate threat of harm.  This places him

18  squarely within the provisions of Penal Code section 667.6(c), and means that, for Apprendi

19  purposes, the facts necessary to support the full and consecutive sentencing were determined by a

20  jury beyond a reasonable doubt.

21          b.      Counts 2 and 5 (Cal. Pen. Code § 667.6(d)

22          For a defendant to be sentenced to consecutive terms under to 667.6(d), the crimes

23  involved must "involve separate victims or involve the same victim on separate occasions."  Cal.

24  Pen. Code § 667.6(d).  To constitute "separate occasions," it is sufficient that the perpetrator had

25  an opportunity to reflect upon but chose to resume his sexually assaultive behavior.

26          Petitioner argues that he should not have been subject to section 667.6(d) liability because

27  he had no "opportunity to reflect" on the offenses committed by his co-perpetrator (Balloon), and

28  that, his co-perpetrator did not have an opportunity to reflect between raping and orally

ed

1  copulating his victim.  Ex. E at 19.  To the extent Petitioner challenges the DCA's finding that

2  under California law an in-concert participant in the listed offenses may be liable under section

3  667.6(d), such review is beyond the purview of this Court.  Under the AEDPA, federal courts

4  sitting in habeas corpus review are bound by a state's interpretation of its own laws.  Souch v.

5  Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), cert. denied, 537 U.S. 859 (2002), rehearing denied,

6  537 U.S. 1149 (2003).  Moreover, the Fifth DCA's finding was not an unreasonable

7  determination of the facts in light of the evidence presented in the State Court proceeding.  28

8  U.S.C. § 2254(d).  California courts recognize that a violent sexual assault made up of varied

9  types of sex acts committed over time may constitute more than one sexual encounter.  Ex. D at

10  43, citing People v. Irvin, 43 Cal.App.4th 1063, 1070-1071 (1996).  And there was ample

11  evidence to support a finding that Balloon had time to reflect on his actions between raping and

12  orally copulating his victim.  After having raped her, he told her to take a shower with him,

13  promising nothing else would happen.  In the shower, he attempted to get her to bend over, but

14  she refused.  Only at that point did he push her down by her shoulders and force her into an act of

15  oral copulation.  The change in locations and the attempt to commit another sexual act in the

16  shower before the forced oral copulation are more than sufficient to support a determination that

17  the perpetrator had an opportunity to reflect between acts.

18      With respect to Petitioner's Apprendi claim, this Court agrees with Respondent that the

19  Fifth DCA's decision was not contrary to nor an unreasonable application of clearly settled

20  Supreme Court law "as of the time of the relevant state-court decision."  Williams, 529 U.S. at

21  413.  As Respondent points out, the Apprendi holding applies on its face to facts which increase

22  the penalty for a crime beyond the statutory maximum.  Apprendi, 530 U.S. at 481 ("We should

23  be clear that nothing in this history suggests that it is impermissible for judges to exercise

24  discretion – taking into consideration various factors relating both to offense and offender – in

25  imposing a judgment within the range prescribed by statute.").  Because Petitioner was not

26  sentenced beyond the maximum sentence on each count (plus those enhancements found to be

27

28

ed

1   true by the jury), the sentence does not conflict with <u>Apprendi</u>.[6]

2   **J.      Ground 10 – Sentencing under 667.6 and "Three Strikes"**

3       1.      Factual Background

4          The trial court sentenced Petitioner both to full consecutive sentences under section 667.6

5   and a doubled sentence under the "three strikes" recidivism statute.  In his petition for review of

6   the decision of the Fifth DCA, Petitioner argues that "the absence of any clear language

7   addressing cumulative application renders the provisions unconstitutionally vague" violating due

8   process and rendering it impossible for counsel to provide effective assistance.  Ex. E at 21,

9   citing U.S. Const., Amends. V, VI, and XIV; <u>United States v. Batchelder, 442 U.S. 114, 123</u>.

10      2.      State Appellate Review

11         Petitioner's federal claims were first raised in his state supreme court petition for review

12  of the Fifth DCA's decision.  He did, however, raise his vagueness claim with the DCA as a

13  matter of state due process.  Regardless, the California Supreme Court's rejection of Petitioner's

14  petition for review constitutes exhaustion of state remedies for purposes of federal habeas

15  review.  The Fifth DCA rejected Petitioner's vagueness claim, finding that the challenged

16  statutes were not ambiguous and were not mutually exclusive.

17          [667.6] is designed to punish multiple aggravated sexual offenses more
        harshly by mandatory full, consecutive sentences.  In conjunction, the Three
18      Strikes law is designed to punish recidivist offenders more harshly.  A similar
        argument was rejected in <u>*People v. Ervin* (1996) 50 Cal.App.4th 259, 264</u>
19      (disapproved on other grounds in *People v. Fuhrman* (1997) 16 Cal.4th 930, 947,
        fn. 11) [footnote omitted]: "the three strikes law and section 667.61 serve
20      different objectives – the former punishes recidivism, the latter aggravated sex
        offenses – and there is simply no reason for suggesting that a recidivist criminal
21      ought to be rewarded because his latest offense is sufficiently heinous to bring
        him within the provisions of section 667.6

22          More recently, a similar argument was rejected by our Supreme Court in
23      <u>*People v. Murphy* (2001) 25 Cal.4th 136, 157-158</u>: "Defendant also contends that
        application of both the Three Strikes law and section 667.71 is contrary to the
24      Legislature's intent....Unlike defendant, we find that the statutes disclose a
        legislative intent that the Three Strikes law apply *in addition to* section 667.61...."

25

26

27      [6]Recent Supreme Court decisions in <u>Blakely v. Washington, 542 U.S. 296</u> (2004), <u>United States v. Booker, 543 U.S. 220 (2005)</u>, and <u>Cunningham v. California, 127 S.Ct. 856 (2007)</u> call this interpretation into question and
28  more broadly define what constitutes the "maximum sentence" for <u>Apprendi</u> purposes.  To the extent <u>Penal Code section 667.6(c)</u> and (d) fall under this expanded interpretation, however, our review is nonetheless foreclosed by <u>Teague v. Lane, 489 U.S. 288 (1989)</u>.

ed

> Defendant fails to point to any language in the Three Strikes law or section 667.6 that supports a conclusion different from the conclusions reached in *Ervin* and *Murphy*. Consequently his contention is rejected.

Ex. D at 45-46.

####    3.    Analysis

Petitioner asserts that the provisions of Cal. Penal Code section 667.6 and the Three Strikes Law are unconstitutionally vague. Ex. E at 21, citing U.S. Const., amends. V, VI, XIV; United States v. Batchelder, 442 U.S. 114, 123 (1979). Due process requires that a state give its citizens fair notice of potentially incriminating conduct. City of Chicago v. Morales, 527 U.S. 41, 56 (1998). Adequate notice is no less required in sentencing statutes. "[V]ague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute. [citations]." Batchelder, 442 U.S. 114, 123 (1979). In United States v. Evans for example, the Supreme Court affirmed dismissal of an indictment for concealing and harboring illegal aliens due to the vagueness of the penalty. The Court found the statute so vague as to the penalty that the Court could not determine the penalty without going beyond "the necessary and proper judicial function of construing statutes" and instead "filling gaps so large that doing so becomes essentially legislative...." Evans, 333 U.S. 483, 486-487 (1948).

This Court does not find that the state courts' determination as to Petitioner's vagueness claim is unreasonable in light of this precedent. Far from ambiguous, the Three Strikes statute explicitly states that it will apply "*in addition to* any other enhancement or punishment provisions which may apply..." (Pen. Code § 667(e) (emphasis added)), and that it will apply "*[n]otwithstanding any other law...in every case* in which a defendant has a prior felony conviction...." (Id. § 667(f)(1) (emphasis added)). This language is sufficiently clear as to the cumulative impact of the Three Strikes law to survive constitutional scrutiny. Therefore Petitioner's claim is denied.

### K.    Ground 11 – Sentencing: Enhancement for Prior Conviction

####    1.    Factual Background

Petitioner's sentence was enhanced under California Penal Code section 667(a), which

1    provides for a five-year enhancement for each prior serious felony conviction.  Petitioner alleges

2    error because the indictment failed to identify the correct Penal Code section with respect to the

3    enhancement.[7]  Petitioner claims that the misidentification in the indictment deprived him of

4    adequate notice in violation of his due process rights.

5            2.        State Appellate Review

6            Petitioner first raised this claim as a matter of state law error before the Fifth DCA, which

7    rejected the claim.  The state appellate court found that although the indictment did indeed cite

8    the wrong penal code section, it clearly charged a serious prior felony conviction within the

9    meaning of Penal Code section 667(a).  Ex. D at 51.  The court noted that a reference to the

10   incorrect penal statute can be overcome by factual allegations adequate to inform the defendant

11   of the crime charged.  Id., citing People v. Haskin, 4 Cal.App.4th at 1439.  The court further

12   noted that given sufficient notice, a judgment modification is only warranted where a defendant

13   has been mislead to his prejudice.  Id., citing People v. Neal, 159 Cal.App.3d 69, 73 (1984);

14   People v. Thomas 43 Cal.3d 818, 830-831 (1987); People v. Wandick, 227 Cal.App.3d 918, 926-

15   927 (1991).

16           The court rejected Petitioner's claim in the first place because he had failed to even allege

17   prejudice.  Moreover, the court found that the facts did not support any finding of prejudice.

18                   Defendant admitted the truth of the prior serious felony conviction.  He
19           was informed and stated he understood the consequence of his admission to be an
             additional five-year enhancement of his sentence.  In addition, he failed to object
20           at sentencing to the imposition of the five-year enhancement.  Consequently, the
             record dispels any notion that defendant was prejudiced by the erroneous Penal
21           Code designation in the indictment.  It is not reasonably probable that the alleged
             error played any role in his decision to admit the truth of the enhancement
22           allegation.  (See e.g., People v. McClellan 6 Cal.4th 367, 381 (1993)).

23   Ex. D at 52.

24           Following the rejection of his appeal by the Fifth DCA, Petitioner made the same

25   argument in his Petition for Review to the California Supreme Court, citing not only violations of

26

27           [7]In relevant part, the indictment alleged: "PRIOR CONVICTION – SERIOUS PRIOR: It is further alleged
     that prior to the commission of each of the offenses charged herein, the said defendant, VANG CHA YANG, was in
28   Fresno County Superior Court No. 457761-5 on or about August 13, 1992, convicted of a serious felony, to wit:
     Section 211 of the Penal Code, within the meaning of Sections 667.5"  The correct provision was 667(a).

California law but of Constitutional due process.  Ex. E at 21-22, citing U.S. Const., amends. V, VI, and XIV; Lankford v. Idaho, 500 U.S. 110 (1991); Apprendi v. New Jersey, 530 U.S. at 476. The California Supreme Court's denial of review exhausts Petitioner's state court remedies for purposes of the present petition.

3.      Analysis of Petitioner's Claim

The Sixth Amendment guarantees a criminal defendant a fundamental right "to be informed of the nature and cause of the accusation."  Givens v. Housewright, 786 F.2d 1378, 1380 (9th Cir. 1986).  The Supreme Court holds that a criminal defendant is entitled to reasonable notice and an opportunity to be heard on a recidivism charge even though due process does not require that he be given notice prior to trial on the substantive offense.  Oyler v. Boles, 368 U.S. 448 (1962), citing Chewning v. Cunningham, 368 U.S. 443, Reynolds v. Cochran, 365 U.S. 525 (1961).  However, a mere error in citation, absent any prejudice to the defendant, does not require reversal.  See U.S. v. Fekri, 650 F.2d 1044, 1046 (9th Cir. 1981), citing Williams v. United States, 168 U.S. 382.  If a defendant is not prejudicially misled by the error in citation, the error is not sufficient grounds for reversal.  U.S. v. Clark, 416 F.2d 63, 64, citing Fed. Rules of Crim. Pro., Rule 7(c).[8]

_____This Court finds that the decision of the Fifth DCA was not unreasonable in light of relevant precedent.  Petitioner fails to articulate any discernable prejudice suffered on account of the misidentification of penal code provisions.  Rather, the record is clear that, despite the misidentification of statutory provisions Petitioner was aware of the penalty he was facing.  See Ex. D at 52.

Petitioner reliance on Lankford v. Idaho, 500 U.S. 110 (1991) is misplaced.  In Lankford, the Supreme Court held that due process was violated where, at the time of sentencing, defendant and his counsel did not have adequate notice that the judge might impose a sentence of death. At the time of sentencing the state informed the court that it would not seek the death penalty, and there was no discussion of the death penalty as a possible sentence at the sentencing hearing.

---

[8] Rule 7(c) provides, in relevant part: "Error in the citation or its omission shall not be ground for dismissal of the indictment or information or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice."

Only after the hearing had concluded did the trial judge indicate his belief that defendant's crimes warranted more severe punishment and mention the possibility of a death sentence. The facts of the present case are clearly distinguishable. As the Fifth DCA noted, Petitioner was "informed and stated he understood the consequence of his admission to be an additional five-year enhancement of his sentence." Ex. D at 52.

Neither does Apprendi v. New Jersey dictate a different result. Citing Jones v. United States, the Court in Apprendi states "any fact (*other than prior conviction*) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." 530 U.S. at 476 (emphasis added). By its terms, Apprendi exempts prior convictions from this Constitutional notice requirement. Moreover, nothing in Apprendi holds that a defect in the indictment cannot be cured through adequate notice to defendant.

For the above reasons, Petitioner's claim is hereby rejected.

**L      Ground 12 – Cruel and Unusual Punishment**

1.      Factual Background

Petitioner contends that his sentence of 94 years for participating in the gang sexual assaults of two minors after having been convicted of a serious felony violates state and federal prohibitions against cruel and unusual punishment. Ex. E at 22.

2.      State Court Review

Petitioner first brought this claim on direct appeal to the Fifth DCA. The Fifth DCA analyzed Petitioner's claim under state law, following the test for disproportionality set forth in In re Lynch, 8 Cal.3d 410, 424 (1972). The court analyzed a number of factors: (1) the degree of danger the offender or offense pose to society; (2) how the punishment compares with punishments for more serious crimes in the same jurisdiction; and (3) how the punishment compares with punishment for the same offense in other jurisdictions. Ex. D at 52, citing Lynch, 8 Cal.3d at 425-427.

Considering Factor 1, the Fifth DCA first noted the significant public safety hazard posed by Petitioner. "Defendant acted in concert to commit the crimes to entertain and enrich a criminal street gang, the existence of which presents a serious danger to public safety. The facts

ed

36

are particularly offensive due to the number of assailants and victims, the youth of the victims, and the duration of the ordeal.  Despite defendant's attempt to minimize the seriousness of his conduct, it is clear his offenses are extremely serious and he poses a serious danger and threat to vulnerable young girls."  Id. At 53.

The court then addressed the heinousness of Petitioner's conduct citing significant state law authority in support of upholding lengthy sentences for violent sex offenders.  Id., citing People v. Wallace, 14 Cal.App.4th 651, 666 (1993) [283 years and 8 months sentence not cruel and unusual]; People v. Huber, 181 Cal.App.3d 601, 633 (1986) [106 years and 4 months sentence not cruel or unusual]; People v. Bestelmeyer, 166 Cal.App.3d 520, 531 (1985) [129 years sentence not cruel or unusual for violent sex offender]; People v. Brown, 28 Cal.APp.4th 591, 601 [full consecutive terms for eight rapes resulting in sentence of 107 years was proper].

The court further noted that Petitioner's sentence had been doubled due to his recidivism, and noted that habitual offender statutes have long withstood constitutional claims of cruel or unusual punishment.  Id. at 54.

With regard to Factor 2, the Fifth DCA rejected Petitioner's comparison of his punishment to that of a murderer as inappropriate, in light of the fact that he was convicted under California's Three Strikes law, which punishes not only current offenses, but also recidivism.

Considering Factor 3 – punishment for similar offenses in other jurisdictions – the Fifth DCA found that Petitioner had failed to meet his burden of showing that his punishment was more extreme than punishments in other jurisdictions with recidivist statutes.  Id. at 55, citing People v. Ingram, 40 Cal.App.4th at 1416 (date) ("We simply note California's Three Strikes scheme is consistent with the nationwide pattern of substantially increasing sentences for habitual offenders.").

3.      Analysis

A criminal sentence that is not proportionate to the crime for which a defendant is convicted may indeed violate the Eighth Amendment.  However, outside of the capital punishment context, "the eighth amendment 'forbids only extreme sentences that are grossly disproportionate to the crime.'"  United States v. Bland, 961 F.2d 123, 129 (9th Cir. 1992),

ed

(quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., joined by O'Connor

and Souter, JJ., concurring) (constituting the holding of the court)).  The threshold for such an

inference of disproportionality is high.[9]  Id.  Generally, so long as the sentenced imposed by the

state court does not exceed statutory maximums, the sentence will not be considered cruel and

unusual punishment under the Eighth Amendment.  United States v. McDougherty, 902 F.2d

569, 576 (9th Cir. 1990).

   With respect to recidivism statutes such as California's Three Strikes law, the Supreme

Court recognizes that "States have a valid interest in deterring and segregating habitual

criminals."  Parke v. Raley, 506 U.S. 20, 27 (1992).  Courts evaluating proportionality of a

sentence must "recognize that legislatures may punish recidivists more severely than first-time

offenders."  Solem v. Helm, 463 U.S. 277, 296.  Recidivism statutes have consistently been

upheld against constitutional challenges, including challenges on eighth amendment grounds.

Parke, 506 U.S. at 27, (citing Spencer v. Texas, 385 U.S. 554, 560).

   This Court finds that the state courts' determination of this issue was neither contrary to

nor an unreasonable application of clearly established Supreme Court precedent.  Petitioner fails

to cite any Supreme Court authority supporting his position that a 94-year sentence under these

circumstances is disproportionately high.  Petitioner instead argues that because the sentence

imposed was more severe than that possible for a first-degree murder conviction, it must be held

disproportionate.  Granted murder is a more grave crime than rape.  See Coker v. Georgia, 433

U.S. 584, 598 ("Rape is without doubt deserving of serious punishment; but in terms of moral

depravity and of the injury to the person and to the public, it does not compare with murder.").

But Petitioner's comparison ignores both the fact that he was convicted of *multiple* counts of

sexual assault involving multiple young victims, and that his sentence was enhanced due to his

recidivism in the form of past convictions for:  being under the influence of a controlled

substance (while a minor); robbery (1992); possession for sale of cocaine (1993); and receipt of

stolen property (1994).

---

[9]  In Harmelin, defendant received a mandatory life sentence without the possibility of parole for possession
of more than 650 grams of cocaine (his first felony offense).  Stressing the serious nature of the offense, the Supreme
Court held that defendant's sentence did not meet the threshold factor of "gross proportionality."

1       A 94-year sentence does not raise an inference of gross disproportionality to Petitioner's

2 current crimes in light of his criminal history.  See, e.g. Harmelin v. Michigan, 501 U.S. 957

3 (1991) (plurality opinion) (upholding sentence of life without possibility of parole for first

4 offense possession of 672 grams of cocaine).  The Fifth DCA's conclusion that Petitioner's

5 sentence was not grossly disproportionate to his crime was not an unreasonable application of or

6 contrary to clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1).

7 Accordingly, Petitioner is not entitled to habeas corpus relief on his Eighth Amendment claim.

8 <u>**RECOMMENDATION**</u>

9       Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas

10 corpus be DENIED and the Clerk of the Court be DIRECTED to enter judgment.

11       These Findings and Recommendations are submitted to the Honorable Lawrence J.

12 O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636

13 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court,

14 Eastern District of California.

15       Within thirty (30) days after being served with a copy, any party may file written

16 objections with the court and serve a copy on all parties.  Such a document should be captioned

17 "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections

18 shall be served and filed within ten (10) court days (plus three days if served by mail) after

19 service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

20 28 U.S.C. § 636 (b)(1)(c).  The parties are advised that failure to file objections within the

21 specified time may waive the right to appeal the District Court's order.  Martinez v. Y1st, 951

22 F.2d 1153 (9th Cir. 1991).

23

24

25 IT IS SO ORDERED.

26 **Dated:    June 19, 2007**                 **/s/ John M. Dixon**
                                     UNITED STATES MAGISTRATE JUDGE

27

28

ed